CUTRER, Judge.
Fred C. Bonsack, Jr., a harbor pilot with the Lake Charles Pilots Association, brought suit pursuant to the Jones Act, 46 *870 U.S.C.A. § 688, and General Maritime Law against Keystone Shipping Company, and its insurer, to recover damages for permanent disability allegedly sustained as a result of an injury incurred while boarding the defendant’s vessel, the M/V “Edgar M. Queeny.” Plaintiff’s motion for a new trial was denied. Plaintiff appealed. We find reversible error and remand for a new trial.
FACTS
The plaintiff is a harbor or bar pilot for vessels at the Port of Lake Charles. His duties consist of boarding ocean going vessels, incoming and outgoing, and advising the masters of these vessels how best to negotiate the ship channel which connects the port and the Gulf of Mexico. When the plaintiff has to board incoming ships he must board the vessel in the open gulf. The plaintiff is taken to the vessel on a launch owned by the Pilots Association and usually boards the vessel by means of a Jacobs Ladder (a rope ladder) on the side of the ship.
On October 3, 1978, the plaintiff was assigned to navigate the “Queeny” into Lake Charles. The plaintiff and an apprentice pilot traveled to the “Queeny,” which was located several miles out in the Gulf of Mexico, aboard the pilot boat, “Lake Charles Pilot.” The apprentice boarded the “Queeny” and was followed by plaintiff. The boarding was accomplished by climbing a Jacobs Ladder which hung from the deck of the “Queeny” down to deck level of the pilot boat.
While ascending the ladder plaintiff experienced a shortness of breath, fatigue and some pain. Plaintiff stopped climbing for a while to alleviate the problems. Afterward, he proceeded to the deck of the “Queeny” where he continued to rest for some time. The plaintiff then went to the wheelhouse of the “Queeny” and supervised the movement of the “Queeny” as the apprentice brought the ship into port. After the ship was docked the plaintiff returned to his home. Being unable to rest and still short of breath, plaintiff was taken to a local hospital emergency room by his wife.
Dr. George Anderson, an internist and plaintiff’s regular physician for several years, saw the plaintiff at the hospital. Dr. Anderson listed plaintiff’s “chief complaint” as shortness of breath. Based on a brief examination and a conversation with plaintiff, Dr. Anderson indicated on plaintiff’s hospital record that the plaintiff’s pre-exist-ing allergies had worsened over the past two months. Dr. Anderson diagnosed plaintiff’s problem as allergic rhinitis. This condition causes some lung congestion.
Dr. Anderson saw plaintiff the following day and, after a more thorough examination, changed his diagnosis to congestive heart failure (CHF). Plaintiff remained hospitalized for several days for treatment. His symptoms of shortness of breath subsided. After further tests, Dr. Anderson was unable to determine the cause of the CHF. Dr. Anderson then referred the plaintiff to Dr. Homer L. Beazley, a cardiologist in Houston, Texas, for further invasive testing to determine the cause of the CHF. After conducting tests on the plaintiff, Dr. Beaz-ley diagnosed the cause of plaintiff’s CHF as cardiomyopathy which is a disease of the heart. Dr. Beazley restricted plaintiff’s physical activity; the plaintiff has not worked as a pilot since the episode on the ladder. Plaintiff was hospitalized for several days in Houston.
The plaintiff brought suit alleging that he was damaged and suffered disability as a result of a heart attack, suffered on the ladder of the “Queeny,” brought about by the defendant’s negligence in not following Coast Guard regulations requiring certain types of boarding ladders for pilots and the unseaworthiness of the “Queeny” based on the absence of this special “accommodation” ladder.
After trial the trial judge submitted ten special interrogatories to the jury for determination.[1] The first interrogatory was as follows:

“1. Did Fred Bonsack, plaintiff, suffer damages as a result of an injury on the boarding ladder of the S.S. EDGAR M. QUEENY on October 3,1978?

*871 YES- NO-

If your answer to Question No. 1 is ‘no’, proceed no further.

If your answer is ‘yes’, go to Question No. 2.”

The jury answered the first interrogatory “No” and, as instructed, none of the remaining interrogatories were answered. The jury returned the interrogatory form to the judge. Plaintiff appealed from a dismissal of his suit.
Three issues are presented on appeal for determination: '
(1) Whether the jury committed error in its conclusion that plaintiff did not suffer damages as a result of an injury incurred while boarding the “Queeny;”
(2) Whether the trial judge committed error in his response to a question from the jury; and
(3) Whether the trial judge committed error in overruling plaintiff’s objection to defendant counsel’s closing argument.
Due to our disposition of the first issue we do not deem it necessary to address the remaining issues.
WHETHER PLAINTIFF WAS DAMAGED AS A RESULT OF THE BOARDING OF THE “QUEENY.”
As we approach this issue we must note that the standard of review by the Louisiana appellate courts in maritime cases is governed by federal standards of review. Under the federal standard, a jury finding in a maritime case will not be disturbed on appeal unless there is no reasonable evidentiary basis for the jury’s conclusion. Rains v. Diamond M. Co., 396 So.2d 306 (La.App. 3rd Cir.1981), writ ref’d, 399 So.2d 623 (La.1981), cert. den., 451 U.S. 1015, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1981).
With this principle in mind, we set about our task of determining whether the jury had a reasonable evidentiary basis for concluding that plaintiff suffered no damage as a result of his climb of the ladder in question.
Plaintiff testified that before the accident he had some occasions of shortness of breath but it had not interfered with his work. He attributed the problem to his allergy condition. He stated that the shortness of breath, fatigue and some pain experienced by him as he climbed the ladder on October 3, 1978, was more severe than he had previously experienced.
Plaintiff was examined by three physicians after this occurrence. In addition to Dr. Anderson of Lake Charles, and Dr. Beazley of Houston, Dr. John Phillips, a cardiologist of New Orleans, examined plaintiff.
The medical testimony evolves principally around plaintiff’s physical condition prior to the incident and the possible effects of the exertion of the climb upon the pre-existing condition of cardiomyopathy (disease of the heart); i.e., whether the pre-existing condition was aggravated by the climb thereby causing the plaintiff’s disability to perform his duties.
We are not called upon to decide the extent of plaintiff’s disability as a result of the climbing incident; we are to decide only the narrow issue of whether the evidence reflected that plaintiff suffered some damage as a result of or caused by the climb in question.
The testimony of the two cardiologists was consistent on the point that the exertion of the climb of the 40-foot ladder intensified the symptoms of plaintiff’s heart condition. Dr. Beazley testified that plaintiff’s heart condition “definitely was suddenly intensified with an event of sudden excessive use” by climbing the ladder. He further stated that the climb intensified the symptoms of plaintiff’s condition to the extent that it led plaintiff to seek medical attention which ultimately led to the diagnosis of the heart disease.
Dr. John Phillips testified that the climb of the ladder by plaintiff caused a temporary aggravation of the plaintiff’s symptoms. Dr. Phillips defined “temporary aggravation” as “the pre-existing condition is worsened or made more severe for a time with no residual alteration of the underly *872 ing condition and without leaving any continuing impairment beyond that time.”
Dr. Anderson went further than the cardiologists. He was of the opinion that the exertion of plaintiff’s climb aggravated the plaintiff’s heart condition and such aggravation contributed to his disability.
This brief review of the medical testimony brings us to the conclusion that the jury did not have a reasonable evidentiary basis for its conclusion that plaintiff did not suffer damages as a result of an injury on the boarding ladder of the “S.S. Edgar M. Queeny” on October 3,1978. It is undisputed that plaintiff incurred at least a sudden intensification of symptoms of his heart condition which intensification was caused by the physical exertion needed to climb the ladder. This sudden intensification of symptoms is an injury that is measureable in damages. We do not decide the extent of the injury or the amount of damages. Neither the extent of injury nor the amount of damages is presented for answer by this interrogatory.
We find that the jury committed manifest error when it answered the interrogatory in the negative. None of the remaining interrogatories were considered or answered by the jury as a result of the answer to the first interrogatory. Under these circumstances, we cannot, on appellate review, make any determination of the answers to the remaining interrogatories. The judgment of the trial court must be reversed and set aside; the suit remanded, and a new trial ordered.
For these reasons the judgment of the trial court is reversed and set aside. The case will be remanded for a new trial not inconsistent with the views expressed herein. Costs of this appeal are assessed to the defendants-appellees.
REVERSED AND REMANDED.
APPENDIX
Attachment of list of interrogatories as designated by Footnote (1).
“1. Did Fred Bonsack, plaintiff, suffer damages as a result of an injury on the boarding ladder of the S.S. EDGAR M. QUEENY on October 3,1978?
YES- NO-
If your answer to Question No. 1 is ‘no’, proceed no further. If your answer is ‘yes’, go to question No. 2.
2. Was Captain Fred Bonsack a seaman who was employed by the S.S. EDGAR M. QUEENY?
YES- NO-
If your answer to Question No. 2 is ‘no’, skip Questions No. 3 and 4 and proceed to Question No. 5. If your answer to No. 2 is ‘yes’, proceed to Question No. 3.
3. Was Keystone Shipping Company, its masters, agents or servants, negligent and, if so, did this negligence play any part, no matter how small, in bringing about Captain Fred Bonsack’s injury?
YES- NO-
4. Was the S.S. EDGAR M. QUEENY unseaworthy and, if so, was such unseaworthiness a legal cause of Captain Fred Bonsack’s accident and injury?
YES- NO-
5. In the alternative, was the Keystone Shipping Company, its masters, agents or servants, negligent and, if so, was that negligence a legal cause of plaintiff’s injury?
YES- NO-
6. Was Captain Fred Bonsack negligent and, if so, was his negligence a legal cause of the accident and injury?
YES- NO-
7. If you have found Captain Fred Bonsack negligent, what percentage did this negligence contribute in his accident and injury?

-%

8. If you have found Keystone Shipping Company at fault, what percentage did this fault contribute to Captain Bonsack’s injury?

-%

9. What is the total amount of damages sustained, if any, by Captain Fred Bonsack as a result of his accident and injury?
$-
10.Is Captain Fred Bonsack entitled to punitive damages against Keystone Shipping Company as owner of S.S. EDGAR M. QUEENY?
YES- NO-
If yes, what is the amount of punitive damages due?
$- ”

. A list of these interrogatories is attached to this opinion.